**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **RONNIE SMITH, ELMA J. JOHNSON, DEREK COLSON, ALLEN D. POWELL, and CURTIS BRADSHAW,** | |
| Plaintiffs, | |
| v. | Civil Action No. 7:14-CV-112 (HL) |
| **THE CITY OF THOMASVILLE, GEORGIA, a governmental entity, THE CITY OF THOMASVILLE FIRE DEPARTMENT, a governmental entity, BRYAN CROFT, Individually, TIM CONNELL, Individually, and DOES 1-10, Inclusive**, | |
| Defendants. | |

**ORDER**

Plaintiffs Ronnie Smith, Elma J. Johnson, Derek Colson, Allen D. Powell, and Curtis Bradshaw, African-American men who either previously or presently work for the City of Thomasville Fire Department, initiated this lawsuit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), 42 U.S.C. § 1981, and O.C.G.A. § 45-19-29, alleging that the City of Thomasville ("the City"), the City of Thomasville Fire Department ("Fire Department" or "Department"), Bryan Croft, and Tim Connell (collectively "Defendants")[1]

---

[1] In their Complaint, Plaintiffs name as Defendants Does 1-10. However, the Complaint contains no specific allegations pertaining to these unnamed

subjected them to disparate treatment in the terms and conditions of their employment on the basis of their race by denying them training and promotion opportunities and by paying them less than other similarly situated White employees. Plaintiffs further contend that Defendants retaliated against them and perpetuated a hostile work environment.   Presently before the Court is Defendants' Motion for Summary Judgment. (Doc. 24). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and determining that there is no genuine dispute of the material facts, the Court finds that Defendants are entitled to judgment as a matter of law and grants Defendants' motion.

## I.   PLAINTIFF'S REQUEST FOR ORAL ARGUMENT

Plaintiffs filed a Request for Oral Argument in relation to the pending motion for summary judgment. (Doc. 32). The Court has thoroughly reviewed the briefs and the evidence of record and concludes that a hearing is not warranted. Plaintiffs' request for oral argument is therefore denied.

---

individuals. Nor in the course of briefing the motion for summary judgment have Plaintiffs indicated who these individuals may be or how they discriminated against Plaintiffs. The Doe defendants are accordingly dismissed. See Fed.R.Civ.P. 10(a) ("Every pleading must . . . name all the parties[.]"); see also Plaintiff B v. Francis, 631 F.3d 1310, 1315 (2011) (Rule 10(a) "protects the public's legitimate interest in knowing all of the facts involved, including the identities of the parties" and "creates a strong presumption in favor of parties proceeding in their own names") (internal quotation marks omitted).

## II.    FACTUAL BACKGROUND

Plaintiffs filed their Complaint for Damages on July 16, 2014, asserting in three generalized counts that Defendants discriminated against them on the basis of their race by subjecting them to "harassment, intimidation and an offensive, hostile working environment." (Doc. 1, ¶¶ 66, 77, 86). While Plaintiffs presented their claims cumulatively, each individual Plaintiff has stated varying claims against Defendants, and each has filed his own charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The following is a recitation of the undisputed facts material to each individual's claims:

### A.    Derek Colson

The City of Thomasville Fire Department hired Plaintiff Derek Colson as a firefighter on November 27, 2000. (DSOMF ¶ 2; Colson Dep., p. 12-13).[2] Colson, who remains employed by the Fire Department, has received several promotions during his tenure with the Department. (DSOMF ¶¶ 2, 4, 64). He received his first promotion in December of 2003 when he was named a Driver-Engineer. (DSOMF ¶ 2). Then, in July of 2005, Colson advanced to the position of Life Safety Educator and was named a Lieutenant. (DSOMF ¶ 4). Approximately one year later, Colson was promoted again to become a Fire Inspector. (Colson Dep., p. 35). Colson complains that while other White firefighters, such as Clay Phillips,

---

[2] "DSOMF" refers to Defendants' Statement of Material Facts. The cited paragraphs are those admitted by Plaintiff.

who bridged from the position of Life Safety Educator to Fire Inspector also advanced in title from Lieutenant to Captain, Colson remained a Lieutenant. (Colson Dep., p. 34-35). However, Colson does not know how long Phillips held the position of Lieutenant before becoming a Captain. (Colson Dep., p. 36).

Throughout his employment with the Fire Department, Colson has received no less than sixteen pay increases between December 31, 2002 and July 6, 2015. (DSOMF ¶ 5). Colson contends that other White firefighters with similar lengths of service and experience were paid more than he was; however, he has presented no evidence to that effect. (DSOMF ¶ 3).

Colson, like the other Plaintiffs in this case, alleges that the Department in general is hostile toward the few African-American firefighters employed by the Fire Department. For example, Colson describes an e-mail he received from Chief Bryan Croft in 2008, which Colson found offensive. (DSOMF ¶¶ 6-7). The e-mail depicted how several past presidents aged while in office, including the recently elected Barack Obama and his wife Michelle, who the original author of the e-mail predicts will age to look like characters from the television series "Sanford & Son." (Colson Dep., p. 45). Colson did not tell Croft that he was offended by e-mail, nor did he report the e-mail to human resources, which he felt would be a waste of time. (DSOMF ¶ 8; Colson Dep., p. 45). Colson instead reported the e-mail to the local NAACP, which then notified the Mayor, the City

Council, and the City Manager. (Colson Aff., ¶¶ 9-10). The City Manager met with the NAACP to discuss the contents of the e-mail. (Colson Aff., ¶ 11).

Colson describes another incident when he and Plaintiff Curtis Bradshaw were denied use of the Department's credit card.[3] The City of Thomasville maintains guidelines for reserving credit cards. (DSOMF ¶ 9). Prior to a scheduled training in Forsyth, Georgia, a White firefighter by the name of John Harper requested a city credit card from the finance department. (DSOMF ¶ 10). The finance department told Harper that no city credit cards were available. (DSOMF ¶ 10). Harper then asked Chief Croft for one of the Fire Department's credit cards. (DSOMF ¶ 11).[4] Chief Croft permitted Harper use of the one remaining spare credit card. (DSOMF ¶¶ 11, 13).

Sometime thereafter Colson also inquired about use of a city credit card from the finance department. (DSOMF ¶ 13). Like Harper, Colson was told that the city had no cards available and that he would have to speak with Chief Croft.

---

[3] There is no indication in the record when this series of events transpired.

[4] There is an immaterial dispute regarding the number of credit cards held by the Fire Department. In responding to Defendants' statement of material facts, Plaintiffs contend that the Fire Department has five credit cards available. (Sangster Dep., p. 11-12). In his affidavit, Colson states that Sangster testified that that the Department had eight credit cards. (Colson Sep., ¶ 15). Defendants aver that the Fire Department has only two cards, one of which must be held by the Chief at all times. (Croft Dep., p. 78).

(DSOMF ¶ 14). Since Chief Croft lent the last of the spare credit cards to Harper, Croft was unable to provide a credit card to Colson. (DSOMF ¶ 15).[5]

Colson next expresses his concern that he and Bradshaw were singled out on the basis of their race when the Department placed monitors on the departmental vehicle they drove.[6] At some point, the City of Thomasville began looking into investing in a tracking system for all City vehicles to monitor not only use of the vehicles but also oil life and other diagnostics to better maintain the City's property. (DSOMF ¶ 18). The monitoring devices were too expensive, so the City decided not to purchase the monitors. (DSOMF ¶ 19). Chief Croft then learned about another less expensive system that he decided to implement on two of the Fire Department's vehicles – the fire prevention vehicle and the battalion vehicle. (DSOMF ¶¶ 20-21). According to Colson, only African-American employees operated these two vehicles. (Colson Aff. ¶ 16). Monitors were not placed on the other two departmental vehicles, which Colson states were driven by White employees. (Colson Aff. ¶ 17). However, Chief Croft explained that the Department decided not to place monitors on those other

---

[5] Even though Colson and Bradshaw did not have physical custody of the Department's credit card, their hotel expenses still were covered by the card. They had to wait for Harper to present the card to the hotel. (Colson Dep., p. 57).
[6] As with the credit card incident, it is not readily apparent from the record when the Department decided to place the monitors on the subject vehicles.

vehicles because they were scheduled for replacement, and the Department opted to save the money. (DSOMF ¶ 22).[7]

In addition to his complaints about the often unfriendly environment, Colson alleges that he was denied the opportunity to train as an arson investigator. (DSOMF ¶ 46). Chief Croft admits that he did not grant Colson permission to take the second part of the arson investigation. (DSOMF ¶ 47). He justified the decision by explaining, first, that Colson needed to concentrate on his fire inspections, and, second, that Colson had not yet completed the required ten fire investigations under the supervision of a certified arson investigator. (DSOMF ¶ 47).

At some point in 2011, Chief Croft and Assistant Chief Tim Connell raised concerns with the City's Human Resources department regarding both Colson and Bradshaw's performance as Fire Inspectors and their failure to timely conduct commercial inspections of local businesses. (DSOMF ¶¶ 23-24). Colson

---

[7] Chief Croft further testified that he received regular reports that Colson and Bradshaw were traveling outside the city limits on a regular basis. (DSOMF ¶ 16). However, neither party presents any facts tending to directly link these reports to the decision to place monitors on any of the Department's vehicles. Additionally, while Colson and Bradshaw contend that they were somehow singled out by the placement of the monitors, they have put forth no evidence of how the monitors impacted their continued employment with the Department. For example, there is no evidence in the record that they were disciplined as a result of any information gathered from the monitors. Additionally, Colson testified that had someone in the City's shop not told them about the monitors, Colson and Bradshaw would not even have known they were there. (Colson Dep., p. 68).

and Bradshaw both admit that they were not inspecting all of the business in Thomasville within the calendar year. (DSOMF ¶ 26). However, according to Colson and Bradshaw, it is not possible to inspect all of the commercial buildings within that time frame. (DSOMF ¶ 27; Colson Dep., p. 69-70). Colson further complained to Chief Croft that he and Bradshaw lacked the proper equipment and software to efficiently perform the inspections. (Colson Dep., p. 69). Without the necessary equipment, record keeping became disorganized, and it was difficult to keep track of what inspections had and had not been completed. (DSOMF ¶ 28).

Chief Croft and Assistant Chief Connell met with Colson and Bradshaw to discuss the ongoing issue with conducting timely inspections. (DSOMF ¶ 56). Colson and Bradshaw were informed that while they would still receive their regular merit increase, the increase would only be 1.5% instead of the standard 3%. (DSOMF ¶ 25).[8] As a part of the meeting, benchmarks were established for the completion of inspections. (DOSMF ¶ 29). Colson and Bradshaw were told that upon successful completion of the benchmarks, they would receive the remainder of their merit increase. (DSOMF ¶ 31). Following the meeting, Chief

---

[8] In his response to Defendants' statement of material facts, Colson states that he did not receive the full merit increase because Connell interfered with his hazmat certification. The portion of Colson's deposition upon which he relies to contest this statement of facts, though, appears to address a different sequence of events that occurred at another time and not in relation to the meeting about inspection benchmarks.

Croft again reviewed the inspection records and discovered discrepancies that Colson explained occurred because he was still keeping paper files of the inspections he completed rather than entering the information into the computer system. (DSOMF ¶¶ 41-43). Colson and Bradshaw further noted that the paper files would go missing on occasion, which presented further difficulty in verifying whether or not inspections had been completed. (DSOMF ¶ 44).

During this same meeting, Chief Croft addressed certification issues with Colson. (DSOMF ¶ 32).[9] Croft informed Colson that he had been decertified as a Life Safety Educator because he had not completed the necessary training course to remain certified. (DSOMF ¶ 33). Colson explained that he attended and passed the required class in 2005. (DSOMF ¶ 34). According to Colson, after he completed the course, Chief Croft and Tim Connell were supposed to send verification that Colson passed the class to the state office of standards and training, but they failed to do so. (DSOMF ¶ 35). Chief Croft posited that state likely lost the paperwork. (DSOMF ¶ 36). Croft attempted to rectify the situation by contacting the office of standards and training and further offered to send a letter verifying that Colson had completed the training and should be reinstated.

---

[9] Chief Croft conducted a similar conversation with Bradshaw, who also had been decertified as a result of the missing paperwork. As with Colson, Croft offered to assist in rectifying the situation and asked that Bradshaw provide a copy of his certification for Croft to then forward to the state. (DSOMF ¶ 38). After being moved to Suppression, Bradshaw lost interest in the certification and never followed up with Chief Croft. (DSOMF ¶ 39).

(DSOMF ¶¶ 36-37). Chief Croft requested that Colson provide a copy of his certification so that he could forward the document to the state office to ensure Colson's reinstatement. (DSOMF ¶ 38). Despite Chief Croft's attempts to follow up with Colson, Colson did not respond. (DSOMF ¶ 40).[10]

Around the same time frame, Colson filed his first Charge of Discrimination with the EEOC on August 25, 2011. (Doc. 1-1, p. 7). Colson reported to the EEOC that he had been discriminated against based on his race and alleged that his employer paid him less than his White coworkers. (Id.). He further complained that he received a "deficit evaluation" because he lost his state certification. (Id.).

Colson contends that following the filing of his charge of discrimination, a series of events took place that he views as retaliatory. First, shortly after the meeting regarding inspections, the Department underwent a reorganization that resulted in both Colson and Bradshaw being removed from their roles as Fire Inspectors and placed in Suppression. (DSOMF ¶ 42). As a result of the transfer, both Colson's scheduled hours and pay rate changed. (DSOMF ¶ 48). Colson's

---

[10] Colson attempts to explain that all certifications were kept in Assistant Chief Allen Powell's office and that the files of each of the Plaintiffs in this lawsuit disappeared without explanation. In support of this assertion, Colson points to the deposition testimony of Donna Langston, a police officer with the City of Thomasville. Langston did testify that she investigated the disappearance of the files at Powell's request. (Langston Dep., p. 6-7). According to her testimony, though, her investigation took place less than a year prior to her September 2015 deposition. (Langston Dep., p. 6). The issue with Colson's certification was raised in 2011.

hourly rate went from $17.09 per hour to $12.21 per hour. (Id.). His hours changed from regular 8:00 a.m. to 5:00 p.m. shifts to 24 hours on and 48 hours off. (Id.). Colson contends that the reassignment effectively was a demotion because he ended up having to work twice the hours to receive the same pay. (Colson Dep., p. 39). However, as Defendants explain, a firefighter working a twenty-four hour shift is paid for both sleeping and waking hours, which effectively means that neither Colson nor Bradshaw ended up earning any less on an annual basis. (DSOMF ¶ 48).

Then, in the fall of 2011, the Georgia Bureau of Investigation ("GBI") at the request of the Thomasville Police Department launched an investigation into Colson's alleged theft of recycling funds. (DSOMF ¶¶ 52, 53; Rich Dep., p. 16). One of Colson's duties as the head of fire prevention was the management of the Georgia Burn Victims Foundation's (the "Foundation") recycling program. (DSOMF ¶ 49). Colson periodically would collect aluminum cans donated by the public to community recycling centers then exchange the cans for funds to be donated to the Foundation. (DSOMF ¶¶ 50-51). At some point, it was discovered that while the cans were being collected, the funds were not being deposited with the Foundation. (DSOMF ¶ 52). According to Bahan Rich, an Investigator with the GBI, the Foundation reported to the Fire Department that it had not received donations in a number of years. (Rich Dep., p. 11-12). Agent Rich's investigation

further revealed that even though there were records of Colson collecting cans on at least two known occasions, the money was never turned over to the Foundation. (Rich Dep., p. 12). On at least one instance, Colson instructed the recycling center to make the check out to him personally rather than to the Fire Department. (Rich Dep., p. 12-13). Those funds were never given to the Foundation. (Rich Dep., p. 13). Agent Rich ultimately concluded that there was sufficient probable cause to arrest Colson for theft by taking and making false statements and writings. (DSOMF ¶ 58). To date, Colson has not been indicted. (DSOMF ¶ 60).

Colson believes that the investigation was nothing more than an excuse for Chief Croft to undermine Colson's employment discrimination claims. (Colson Dep., p. 17). Colson testified during his deposition that he gave all of the recycling proceeds to Chief Croft and essentially implicated Croft in the theft based on rumors that Croft had in the past misappropriated funds from the local union. (DSOMF ¶ 56; Colson Dep., p. 17). But according to Agent Rich, the GBI never considered Chief Croft as a suspect. (DSOMF ¶ 57; Rich Dep., p. 32).

Colson's final allegation is that the Fire Department in 2011 denied him use of adequate safety gear and gloves. (Colson Dep., p. 59). Colson describes an occasion where prior to training he informed Assistant Chief Connell that he needed gloves. (DSOMF ¶ 61). Connell told Colson to get some gloves out of the

trash can in the boiler room. (Id.). David Dieckmann, Colson's supervisor went with Connell to the boiler room. (Colson Dep., p. 60). Upon inspection of the gloves, Dieckmann said that Colson could not use those gloves because they were dry-rotted. (DSOMF ¶ 63; Colson Dep., p. 60). Craig Dukes lent Colson a spare pair of his gloves. (DSOMF ¶ 63). Colson states that he still is waiting for a new pair of gloves and a second set of turnout gear. (Colson Dep., p. 61-62). Colson has not worked as a firefighter since January 15, 2015 as a result of a workers' compensation injury unrelated to the adequacy of his work gear. (DSOMF ¶ 64).

Colson filed a second Charge of Discrimination on March 20, 2012, alleging again that he has been subjected to a hostile work environment, denied merit increases, and demoted. (Doc. 1-1, p. 8). Colson's charge contends that his employer's conduct is in retaliation for his previously filed charge. (Id.). The EEOC issued Colson a Notice of Right to Sue dated April 17, 2014. (Doc. 1-1, p. 9-10). Subsequent to filing this lawsuit, Colson filed a third Charge of Discrimination dated July 9, 2015, alleging discrimination based on his race as well as retaliation. (Doc. 25-2).

### B.    Curtis Bradshaw

Plaintiff Curtis Bradshaw began working for the Thomasville Fire Department as a firefighter on April 5, 2004. (DSOMF ¶ 65). In August 2005,

Chief Croft authorized Bradshaw's promotion to Life Safety Educator, a position in which Bradshaw was interested and actively sought. (DSOMF ¶ 66; Bradshaw Dep., p. 24-25). Chief Croft specifically recommended Bradshaw for the promotion even though there were other applicants with more experience who applied for the position. (DSOMF ¶ 67). The promotion brought with it an increase in pay from $7.96 per hour to $12.50 per hour. (DSOMF ¶ 66). However, Bradshaw contends that the increase in pay was not sufficient. (Bradshaw Dep., p. 26). When Bradshaw moved into the Life Safety Educator position, he maintained the title of firefighter. (Id.). Bradshaw believed that since the individual who previously held the position had the title of Lieutenant he, too, should have received a change in title. (DSOMF ¶ 68). Yet Bradshaw also understood that Chief Croft's intent was for Bradshaw to remain a firefighter until he completed the required coursework required for a Lieutenant. (Bradshaw Dep., p. 28).

Bradshaw, like Colson, also complains that he was denied the opportunity to take the second part of the arson investigation class even though he had already completed three of the ten required arson investigations. (DSOMF ¶ 73-74; Bradshaw Aff. ¶ 11). Bradshaw contends that Chief Croft permitted White firemen, such as Craig Hunley and Jeff Duke, to complete the course but denied the same opportunity to Bradshaw and the other African-American firefighters.

14

(Bradshaw Aff. ¶ 11). As with Colson, Chief Croft explained that he felt as though Bradshaw needed to focus on his fire inspections and that at the time Bradshaw requested to attend the second portion of the arson investigation course he had not yet completed the required number of fire investigations under the supervision of a certified arson investigator. (DSOMF ¶ 74).

Bradshaw generally alleges that the African-American firefighters did not receive the same recognition as the White firefighters. (Doc. 1, ¶ 51). Bradshaw specifically notes that Chief Croft never awarded an African-American fireman the Firefighter of the Year award. (Id.). The award itself is voted on by all of the members of the department, but according to Bradshaw, Chief Croft had the final say in who received the award. (DSOMF ¶ 70; Bradshaw Aff. ¶ 20). Chief Croft did have absolute discretion in awarding the Chief Award. (DSOMF ¶ 71). Despite Bradshaw's contention that Chief Croft almost exclusively awarded this honor to White firefighters, Elma Johnson, an African-American firefighter who is also one of the plaintiffs in this case, received the award on at least one occasion. (DSOMF ¶ 72).

Bradshaw filed his first Charge of Discrimination with the EEOC on August 25, 2011. (Doc. 1-1, p. 11). His charge mirrors Colson's, alleging generally that he was discriminated against on the basis of his race, that he was given negative performance evaluations, and that he was being paid less than his White

counterparts. (Id.). Shortly thereafter, as previously discussed in the context of Colson, the Department underwent a reorganization that resulted in Bradshaw's reassignment to Suppression. (DSOMF ¶ 42). Bradshaw shares Colson's view that the reassignment and change in hours in pay amounted to a demotion rather than a mere reassignment. (Bradshaw Dep., p. 35-36). On April 6, 2012, Bradshaw filed his second Charge of Discrimination, alleging that his employer retaliated against him by denying his pay increase[11] and by demoting him. (Doc. 1-1, p. 12).

Bradshaw states that upon moving back to Suppression, the environment in the Fire Department became increasingly hostile. (Bradshaw Dep., p. 50). Bradshaw describes a particularly disturbing incident that occurred the morning of August 29, 2013. On that morning, Bradshaw was returning to his bedroom at the fire station. (DSOMF ¶ 75). As Bradshaw reached for his radio charger, he noticed a rope tied in a noose hanging from his bed. (DSOMF ¶ 75). Bradshaw reported the discovery to his supervisor Greg Owens. (Bradshaw Aff. ¶ 6). Someone notified the Thomas County Sheriff's Department, and Investigator

---

[11] Although in his charge Bradshaw denies knowing why he was denied a pay increase, the Court finds it apparent that Bradshaw is referring to the reduced merit increase that occurred as a result of his and Colson's failure to complete the number of fire inspections expected by the Department – the same merit increase that Chief Croft indicated would be increased to the full amount provided Colson and Bradshaw met the benchmark set for them. (Bradshaw Dep., p. 54).

Pascal Autrey arrived to investigate. (DSOMF ¶ 76). Investigator Autrey interviewed Bradshaw and asked if he would be willing to take a lie detector test. (DSOMF ¶ 77). The purpose of the lie detector test was to rule out any scenario in which Bradshaw may have attached the rope to his bed. (DSOMF ¶ 80). On the advice of counsel, Bradshaw declined. (DSOMF ¶ 78). Ultimately, without Bradshaw's cooperation, Investigator Autrey was unable to unearth any other leads and closed the case. (DSOMF ¶ 81).

The EEOC issued Bradshaw a Notice of Right to Sue for his first two EEOC complaints on April 17, 2014. Bradshaw and the other Plaintiffs in this case filed their lawsuit on July 16, 2014. Several weeks following the filing of the lawsuit, Bradshaw was transferred to Engine 1, which according to Bradshaw responds to the majority of the Department's calls. (DSOMF ¶ 82). At least fifteen other firefighters were transferred at the same time. (DSOMF ¶ 84). Bradshaw filed a third Charge of Discrimination on January 1, 2015 alleging that this transfer was discriminatory and in retaliation for his earlier charges. (Doc. 25-4, p. 7).

In January 2014, Chief Chris Bowman issued a general order requiring every firefighter to take and pass the NPQ Firefighter I and Firefighter II exams by July 1, 2015 in order to maintain employment with the Department. (DSOMF ¶ 99). Bradshaw did not attempt the NPQ Firefighter I exam until September 2014.

(DSOMF ¶ 100). Bradshaw failed the exam on his first attempt. (Id.). He took the exam again in October 2014 and passed. (DSOMF ¶ 101). As of May 2015, 40 out of 42 firemen had taken and passed both of the required exams. (DSOMF ¶ 103). Bradshaw was one of the two who had not successfully completed both tests. (DSOMF ¶ 104). Bradshaw was informed that he had until July 1, 2015 to pass the second part of the exam or risk termination. (Id.). Bradshaw sat for the test on June 30, 2015 but did not pass. (DSOMF ¶¶ 105-106). As a result of this failure, Bradshaw was terminated from the Fire Department. (DSOMF ¶ 107). On July 9, 2015, Bradshaw filed his fourth Charge of Discrimination alleging that as a result of filing the previous charges, he was "subjected to more severe discriminatory treatment"; that he "suffered physical injuries due to irregular trainings which impacted [his] achievement of further certifications"; and that he was discharged. (Doc. 25-4, p. 8).

### C.    Allen D. Powell

Plaintiff Allen D. Powell joined the Thomasville Fire Department in 1990. (DSOMF ¶ 109). Powell currently holds the rank of Battalion Chief. (DSOMF ¶ 110). The only individual in the Department who outranks him is the Chief. (Id.).

Powell's primary complaints of discrimination center around promotional and training opportunities in the Department. At some point in 2009, Chief Croft created the position of Assistant Chief and promoted Tim Connell, who is White.

18

(DSOMF ¶ 115; Powell Dep., p. 18; Powell Aff. ¶ 4). According to Powell, the position was never posted. (Powell Aff. ¶ 4). Additionally, Powell had ten years more experience than Connell and felt as though he should have been considered for the job. (DSOMF ¶ 115; Powell Dep., p. 19-20). Following Connell's appointment, Powell never discussed his dissatisfaction with being seemingly overlooked for the Assistant Chief position nor did he complain to Human Resources or any other division of the City. (DSOMF ¶ 118). Notably, Powell was already serving as a Battalion Chief at that time; therefore the Assistant Chief position would not have been a promotion.

Powell also alleges that Chief Croft denied him training opportunities, including the chance to train as an arson investigator. (DSOMF ¶ 119). Powell's perception is that Croft "wanted to send his friends first," such as Craig Dukes and Jeff Hundley. (Powell Dep., p. 21). When Powell first approached Croft about training as an arson investigator, Chief Croft said that the training would take too long and that Powell was needed in the firehouse. (DSOMF ¶ 120). When Powell inquired a second time, Chief Croft consented to Powell pursuing the certification but reminded Powell that he could not serve as the official arson investigator because it would be a conflict of interest for Powell to investigate a fire he also helped to extinguish. (DSOMF ¶ 121). Powell does not dispute that the scenario described by Chief Croft would present a conflict. (DSOMF ¶ 122). Despite the

potential for a conflict, Powell still wanted to become an arson investigator. (Powell Dep., p. 23).

Chief Croft left the Fire Department on February 12, 2012, opening up the position of Chief. (DSOMF ¶ 132). While the City conducted a nationwide search for the next Chief, the City temporarily appointed Deputy Chief Bobby Hart as the interim Chief. (DSOMF ¶ 133).[12] Hart had the most seniority within the Department. (DSOMF ¶ 133). According to Powell, Hart did not even want the position. (Powell Dep., p. 30). Powell did not object to Hart being named interim Chief. (Powell Dep., p. 31). Hart served as the interim for a brief period of time before the City hired Chris Bowman as the permanent replacement for Chief Croft. (DSOMF ¶ 135).

Powell voices a few other miscellaneous complaints about occurrences within the Fire Department. He contends that while he was promised a raise upon completion of his four-year degree in fire science, he never received one. (DSOMF ¶ 126). Powell finished his degree in 2010. (DSOMF ¶ 127). He received a $5,000 raise approximately six months later in January 2011. (DSOMF ¶ 128). Powell does not know the source of the $5,000 raise, nor apparently did he inquire about the increase in pay. (DSOMF ¶ 130).

_____

[12] There is no evidence in the record that the City advertised the interim Chief position. From Powell's deposition testimony, it appears that the City simply made the decision to place Hart in the temporary position without any formalities. (Powell Dep., p. 30).

Finally, Powell contends that Chief Croft perpetuated a hostile work environment by sending threatening e-mails. On one occasion in particular Chief Croft sent electronic correspondence to the members of the Department warning that they needed to follow the physical fitness program or risk termination. (DSOMF ¶ 112). Chief Croft sent the e-mail to all of the firefighters in the Department, but Powell perceived that it was directed only at the African-American firefighters. (DSOMF ¶¶ 113-114).

Powell filed his Charge of Discrimination on November 2, 2012, in which he alleged that that he "was not given the opportunity to apply for the position of Chief. The position was not posted, but a similarly situated White male was hired." (Doc. 1-1, p. 5). During his deposition, Powell clarified that he was referring to the interim Chief position. (Powell Dep., p. 30-31). Powell further clarified that while he notes in his charge that he complained about the posting and selection process, those complaints were made generally to "guys in the department" and not through any official channel. (DSOMF ¶ 137). The EEOC issued Powell a Notice of Right to Sue dated April 17, 2014. (Doc. 1-1, p. 6).

### D.    Elma J. Johnson

Plaintiff Elma J. Johnson has been employed by the Thomasville Fire Department since August 4, 1985. (DSOMF ¶ 138). Johnson was promoted to the rank of Lieutenant in 2002 after achieving the highest score on the

promotional exam. (DSOMF ¶ 139). In 2010, the Department recognized Johnson as the Firefighter of the Year. (DSOMF ¶ 140).

Despite his accomplishments within the Department, Johnson alleges that Chief Croft and Tim Connell conspired in 2005 to create an in-house Captain's exam for the exclusive purpose of disqualifying Johnson for the position. (DSOMF ¶ 141). However, Johnson admits that all of the exams are computer generated. (DSOMF ¶ 142). As a result, the tests cannot be manipulated to favor one test taker over another. (Id.).

Next, Johnson complains that Chief Croft overlooked him for the open Captain's position in 2011. (DSOMF ¶ 143). Of the applicants for the position, Johnson ranked second in terms of seniority and achieved the third highest score on the relevant exam. (Id.). In the end, Mark Sealy and Tim Connell were named Captains based on their test scores. (DSOMF ¶ 144). Johnson does not know what Sealy and Connell scored on the exam. (DSOMF ¶ 145). He maintains, though, that the ultimate decision regarding who to promote fell to Chief Croft. (Id.). Chief Croft testified that he always selected those applicants for promotion who scored the highest. (DSOMF ¶ 146).

Finally, Johnson states that he was not selected to head the Fire Prevention division after Colson and Bradshaw were reassigned, nor was he permitted to train as an arson investigator. (DSOMF ¶¶ 147, 149). But Johnson

admits that he never voiced his interest in either of these positions to anyone of authority. (DSOMF ¶¶ 148, 149).

Johnson filed his Charge of Discrimination on June 13, 2012, alleging that he was "treated less favorably regarding training and promotion due to [his] race." (Doc. 1-1, p. 3). The EEOC issued a Notice of Right to Sue to Johnson dated April 17, 2014. (Doc. 1-1, p. 4).

### E.    Ronnie Smith

Plaintiff Ronnie Smith joined the Thomasville Fire Department in February 1993. (DSOMF ¶ 150). Smith alleges that Defendants maintain a work environment that is hostile toward African-Americans. Smith claims that in November 2008, he overheard a White fireman by the name of Marshall Green utter the "N" word while speaking with Captain Benton. (DSOMF ¶ 151). Upon realizing that Smith was present, Benton, who Smith never heard use racially derogatory language, immediately apologized to Smith. (DSOMF ¶¶ 152-153). Smith never complained about this incident to his superiors. (DSOMF ¶ 154). Smith also avers that he once heard an unknown person say that Allen Powell would be the first and the last African-American to reach a high position with the Fire Department. (DSOMF ¶¶ 155-156). Smith reported the comment to Powell, who advised Smith to notify others further up the chain of command, but Smith declined to do so. (DSOMF ¶ 157).

Smith also contends that the Department extended additional aid for the promotional tests to White employees but not to African-American employees. (DSOMF ¶ 158). Specifically, Smith alleges that any firefighter who was friends with Tim Connell passed the exams. (DSOMF ¶ 161). The exams themselves are computer generated from the Ithaca Firefighter IV handbook. (DSOMF ¶ 163). The computer software generates a new set of questions each time it is prompted to prepare an exam. (DSOMF ¶ 164). Despite having access to the study materials, Smith still could not pass the exam. (DSOMF ¶ 165). Smith contends that he failed each time because the material on the exam was not the material Connell told him to study. (Smith Dep., p. 28-29).

Smith filed a Charge of Discrimination on October 5, 2012. In his charge, Smith alleges that the Department discriminated against him on the basis of his race by subjecting him to harassment, by giving test answers to White employees, and by promoting certain individuals without first posting the position. (Doc. 1-1, p. 1). The EEOC provided Smith with a Notice of Suit Rights on October 16, 2012).[13]

Smith's final complaint of discrimination pertains to his transfer to Engine 1 on August 8, 2014, after this lawsuit was filed. (DSOMF ¶ 167). Smith feels as though being moved to the busiest station is "definitely discrimination." (DSOMF

---

[13] The EEOC dismissed Smith's charge as untimely. Defendants have not raised any timeliness issues regarding Smith's Title VII claims.

¶ 168). Yet Smith is unaware of whether other White firefighters were transferred at the same time. (DSOMF ¶ 169).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the

burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## VI.   DISCUSSION

Before delving into the substance of the case before the Court, the Court first takes notice that a number of the claims raised by the five Plaintiffs in this case appear either to be untimely and, therefore, statutorily barred, or have not been properly grieved through the EEOC's administrative process. However, for reasons unknown to the Court, the parties have not raised these timeliness issues. The Court thus is left to address each of Plaintiffs' claims on the merits.

Plaintiffs raise allegations of race discrimination and retaliation against Defendants under Title VII, § 1981, and O.C.G.A. § 45-19-29.[14] For summary

---

[14] Under Georgia law, it is unlawful for a public employer "[t]o fail or refuse to hire, to discharge, or otherwise to discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, national origin, sex, disability, or age." O.C.G.A. § 45-19-29.

judgment purposes, Title VII and § 1981 claim "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). Additionally, because O.C.G.A. § 45-19-29 is functionally equivalent to Title VII, the law permits the court to seek guidance from federal decisions construing a similar federal statute. See Finney v. Dep't of Corr., 263 Ga. 301 (1993). The Court, therefore, will address Plaintiffs' Title VII claims with the understanding that the analysis also applies to Plaintiffs' § 1981 and state law claims.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a *prima facie* case of discrimination through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).

Direct evidence of discrimination is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Id. at 1086. More specifically, direct evidence is evidence which, if believed, proves the existence of a fact in issue without inference or presumption. Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999).

"[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of a protected classification, constitute direct evidence." Kilpatrick v. Tyson Foods, Inc., 268 F. App'x 860, 862 (11th Cir. 2008) (citing Wilson, 376 F.3d at 1086). "[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." Standard, 161 F.3d at 1330. Further, "[t]o be direct evidence, the remark must indicate that the employment decision in question was motivated by race." Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002).

Plaintiffs here have presented no direct evidence of discrimination. Plaintiffs attached two affidavits to their Complaint that Plaintiffs purport constitute direct evidence. In the first affidavit, Albert Hall, who was employed by the Fire Department from 2002 until 2007, states that prior to becoming Chief, Bryan Croft remarked that "when he became Chief of the Thomasville Fire Department he would get rid of all the blacks and old timers." (Doc. 1-1, p. 15). In the second affidavit, Derek Knight, who began working for the Department in 2000, attests that from 2005 to 2012 he witnessed Assistant Chief Tim Connell "deny training opportunities to African Americans and other employees." (Doc. 1-1, p. 16). Neither of these statements constitutes direct evidence of discrimination as no link has been made between the alleged remarks and any

28

decisionmaking process and both require the imposition of inference or presumption to have any context.

Claims of discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087.

## A.     Failure to Promote[15]

Plaintiffs allege that Defendants discriminated against them based on their race by affording promotional opportunities to White firefighters that were otherwise denied to African-American firefighters. To establish a *prima facie* case of discriminatory failure to promote, a plaintiff must prove: "(1) that he is a member of a protected class; (2) that he was qualified for and applied for the promotion; (3) that he was rejected; and (4) that other equally or less qualified employees who were not members of the protected class were promoted." Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997) (citing Wu v. Thomas, 847 F.2d 1480, 1483 (11th Cir. 1988), *cert denied*, 490 U.S. 1006 (1989)). The plaintiff "need only show that he satisfied the employer's objective qualifications." Price v. M & H Valve Co., 177 F. App'x 1, 12 (11th Cir. 2006) (citing Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). Additionally, where an employer institutes a formal procedure to announce a vacancy, the plaintiff must show that he applied for the position; however, where

---

[15] Plaintiffs neglected to break down their claims into anything more than the generalized categories of race discrimination and retaliation, throwing out a myriad of facts that they have not specifically related to any particular claim, leaving both Defendants and the Court in the unenviable position of having to guess the nature of the claims each Plaintiff seeks to assert.  Upon sifting through the factual allegations, for the sake of clarity, the Court has attempted to sort those facts into appropriate and recognized claims of discrimination. Notably, Plaintiffs have presented a number of facts that simply do not amount to discrimination in any cognizable form.

an employer uses informal procedures to identify eligible candidates, a plaintiff need only demonstrate that the employer knew of the plaintiff's interest in the position. See Vessels, 408 F.3d at 768. To satisfy the fourth prong of the *prima facie* analysis, any comparator offered by the plaintiff must be "similarly situated in all relevant aspects." Holifield, 115 F.3d at 1562; see also Brown v. Ala. Dept. of Transp., 597 F.3d 1160, 1174 (11th Cir. 2010).

None of the Plaintiffs have set forth a *prima facie* case for failure to promote. For example, Colson complains that when he advanced from the position of Life Safety Educator to Fire Inspector, he was denied an advancement in title from Lieutenant to Captain, while Clay Phillips, a White firefighter, did achieve the desired change in title. Colson fails to state a claim for failure to promote for several reasons. First, he has not demonstrated that he met the Department's qualifications for Lieutenant at the relevant time. And second, he has not shown that he and Phillips, the only suggested comparator, were similarly situated in all pertinent respects. Bradshaw cannot sustain his promotion claim for similar reasons. At the outset, he admits that while he believed he should have been promoted to Lieutenant from firefighter when Chief Croft promoted him to Life Safety educator, he had not yet completed the coursework required to be named a Lieutenant. He likewise has not named a satisfactory comparator who received more favorable treatment.

Powell claims that he was overlooked for promotion on two different occasions. In 2009, Chief Croft created the position of Assistant Chief and promoted Tim Connell, a White Firefighter, to fill the position. The position itself had not previously existed, and there is no evidence that the position was formally posted. At that time, Powell was already serving as a Battalion Chief, and the only position superior to his was that of Chief. Despite Powell's position that he was better qualified than Connell to serve as Assistant Chief, Powell has presented no evidence Chief Croft knew of his desire to make what otherwise would have been a lateral move.

Powell further alleges that Defendants impermissibly denied him the position of interim Chief in 2012. Again, there is no evidence that the interim position was ever posted. The City simply chose the person with most seniority within the Department while in the process of conducting a nationwide search for a new permanent Chief. Powell additionally has presented no evidence that he expressed an interest in the interim position. Further, while others might have been aware of Powell's ambition to become Chief, Powell does not argue that Chris Bowman, who the City ultimately hired as Chief, was less qualified than he.

Johnson contends that he was denied promotional opportunities on several different occasions. In 2011, Johnson took the Captain's exam. While Johnson performed well on the exam, achieving the third highest score, Mark Seal and

Tim Connell, who are both White, received the promotion while Johnson did not. However, Johnson has no knowledge of how Seal and Connell scored on the exam and has not otherwise demonstrated that he was more qualified for the job. Johnson further complains that he was not selected to head the Fire Prevention division, nor was he selected to train as an arson investigator. But there is no evidence that Johnson ever applied for these positions or in any way made known that he was interested in them.

Even assuming the Plaintiffs have established a *prima facie* claim of failure to promote, they have wholly failed to demonstrate that the Defendants' proffered non-discriminatory reasons for not promoting each of these Plaintiffs was pretextual. To determine pretex, the court must evaluate whether the plaintiff established "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538; see also Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). A plaintiff may not simply recharacterize the employer's proffered nondiscriminatory reasons. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that

reason." Id. The "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010); see also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (the inquiry is limited to the employer's belief that the employee is guilty of the misconduct; that the employee did not actually engage in the misconduct is irrelevant). "[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Id.

While evidence that an employer promoted a less qualified applicant over the plaintiff may be probative of whether an employer's proffered reason for not promoting the plaintiff was pretextual, a plaintiff cannot rely on his allegedly superior qualifications alone to establish pretext. Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000). In order to serve as a foundation for pretext, the disparity in qualification must be "so superior as to allow a reasonable fact finder to conclude" either that the employer's reason for not promoting the plaintiff was pretextual or that the difference in qualifications is so significant that no reasonable employer exercising impartial judgment would choose the other candidate over the plaintiff. Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001).

Plaintiffs have exerted absolutely no effort to establish pretext, stating summarily that pretext should be resolved by a jury. (Doc. 33, p. 9). Having otherwise failed to create an inference of discrimination based on Defendants' promotion practices, Plaintiffs' claims that they were denied promotions because of their race fail as a matter of law.

**B.    Failure to Train**

Plaintiffs also claim that Defendants denied them the opportunity to attend certain training courses. Colson, Bradshaw, Powell, and Johnson each contend that Chief Croft would not approve them to take the arson investigation course. "[N]ot all conduct by an employer negatively affecting an employee constitutes [an] adverse employment action." Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001). An adverse employment action based on a denial of training is actionable only where "an ultimate employment decision . . . or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him . . . of employment opportunities, or adversely affects his . . . status as an employee." Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir. 2000) (citation and quotation omitted). Failure to permit an employee to attend a training class generally does not constitute an adverse employment action. Turner v. Georgia Sec'y of State, 848 F.Supp.2d 1361, 1383

35

(M.D.Ga. 2012) (citing <u>Melton v. Nat'l Dairy, LLC</u>, 705 F.Supp.2d 1303, 1338 (M.D.Ala. 2010)).

There is no evidence of any direct negative impact on any of the Plaintiffs who were not granted leave to take the arson investigation class. Johnson never even expressed a desire to take the class. Powell wanted to take the class for personal reasons but admits that even if he attained the certification his present position would otherwise have prevented him from conducting arson investigations based on an obvious conflict of interest. As for Colson and Bradshaw, at the time they approached Chief Croft about taking the second part of the arson investigation course, they had not yet met the prerequisites for the class. It cannot, therefore, be said that the denial of this particular training opportunity amounts to an adverse employment decision necessary to meet the very basic elements of a *prima facie* case.

## C.   Wage Claims

Plaintiffs' conclusory argument that they have been paid less than their White counterparts is not sufficient to survive summary judgment. To state a *prima face* case of disparate pay, a plaintiff must show that he "occupies a position similar to that of a higher paid employee who is not a member of [his] protected class." <u>Crawford v. Carroll</u>, 529 F.3d 961, 974-75 (11th Cir. 2008) (citing <u>Meeks v. Computer Assocs. Int'l</u>, 15 F.3d 1013, 1019 (11th Cir. 1994)). An

employee identified by the plaintiff as a comparator "must be similarly situated in all relevant respects." Wilson, 376 F.3d at 1091. A comparator is not similarly situated for the purposes of a disparate pay claim if the comparator has a different number of years of experience or seniority form the plaintiff. See Cooper v. Southern Co., 390 F.3d 695, 743 (11th Cir. 2004), *overruled on other grounds by* Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006).

Plaintiffs allege the following in support of their individual disparate pay claims:

Derek Colson: Colson shows that he was hired on November 27, 2000 and has a current rate of pay of $13.26. According to Colson, seven unnamed White employees hired after him are paid at a higher rate. Additionally, one White employee who was hired the same day as Colson is paid at a higher rate.

Curtis Bradshaw: Bradshaw was hired on August 5, 2004. Prior to his termination, Bradshaw was earning $11.30 per hour. Bradshaw alleges that Harper, Manley, Mann, Meechan, and Wood, all White firefighters with less seniority, earned more.

Allen Powell: Powell admits that he is one of the highest paid members of the Department. However, he claims that of the 23 employees citywide who fall into his same earning bracket, only two are African-American.

Elma Johnson: Johnson was hired on August 4, 1985. He recently retired with a pay rate of $16.90. Johnson contends that at least seven White employees earn more than he did at the time of his retirement.

Ronnie Smith: Smith was hired on March 7, 1991 and currently earns $14.62 per hour. Smith shows that a number of White employees hired after him are paid at a higher rate.

The evidence put forth by Plaintiffs in support of their disparate pay claims falls woefully short of establishing a *prima facie* case. Plaintiffs rely on Defendants' pay records in support of their claims. (Docs. 31-4; 31-5; 31-6). The first of these documents (Doc. 31-4) lists each member of the Department along with the individual's rank, salary, and date of employment. The second document (Doc. 31-5) is a breakdown of the income for the five Plaintiffs for the years 2005 through 2013. The final document (Doc. 31-6) is largely comprised of a spreadsheet that lists the name, job title, paygrade, annual salary, race, and gender for what appears to be every employee for the City of Thomasville. While Plaintiffs certainly can pull raw numbers from the documents, what these documents do not evidence, and what Plaintiffs are required to demonstrate to maintain their wage claims, is how any of these other individuals compare to each of the Plaintiffs in relation not only to basic pay rate and length of service but also experience and qualification. Without these additional factors, Plaintiffs

cannot meet their burden of putting forth an appropriate comparator. A number and a different race simply will not suffice. Accordingly, Plaintiffs' wage claims must fail as a matter of law.

### D.    Retaliation

Plaintiffs Colson and Bradshaw additionally assert claims for retaliation.[16] These Plaintiffs contend that after filing their initial Charge of Discrimination, they were subjected to retaliatory conduct by Defendants. Both Colson and Bradshaw contend that Defendants retaliated against them by reassigning them from Fire Inspection to Suppression. Colson further alleges that the investigation into his involvement with the missing recycling money was in direct response to his raising allegations of discrimination.

Under Title VII, an employer may not retaliate against an employee who "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation under Title VII, "a plaintiff must show that (1) [ ]he engaged in statutorily protected

---

[16] Plaintiffs asserted an umbrella claim for retaliation in their Complaint. However, a review of the record demonstrates that only Colson and Bradshaw engaged in any form of activity that may be construed as protected for the purposes of establishing the first element of the *prima facie* case. For that reason, the Court analyzes the retaliation claim in relation to these two Plaintiffs alone.

expression; (2) [ ]he suffered an adverse employment action; and (3) there is a causal connection between the two events." Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000) (quotations omitted).

An action is materially adverse if it might dissuade "a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 126 U.S. 53, 68 (2006). A causal relationship must be established through evidence that the "desire to retaliate" against the protected expression was the "but-for cause" of the adverse action. See Univ. of Tex. Sw. Med. Ctr. V. Nassar, ____ U.S. ____, 133 S.Ct. 2517, 2528 (2013). A plaintiff may also establish the existence of a causal connection by demonstrating a close temporal proximity between the protected activity and the adverse employment action. See Thomas v. Cooper Lighting, 506 F.3d 1361, 1364 (11th Cir. 2007). Absent other evidence of causation, temporal proximity must be "very close." Id. (three to four month period between the protected activity and the adverse employment action not enough to show "very close" temporal proximity).

There is no dispute that Colson and Bradshaw each engaged in a protected activity when they filed their initial charges with the EEOC. Even assuming for the sake of argument that the reassignment about which Colson and Bradshaw complain may be interpreted as an adverse employment action, Colson and Bradshaw cannot demonstrate a close temporal proximity to meet

the causation requirement for their *prima facie* case. These Plaintiffs filed their charge of discrimination on August 25, 2011. The reassignment did not take place until November 14, 2011 (Docs. 35-3, p. 1, 35-5, p. 7), almost three months later, a span of time that has been held to not be enough to show "very close" temporal proximity. Id.

As for Colson's contention that the GBI's investigation relating to Colson's alleged failure to turn over recycling proceeds to the Georgia Burn Victims Foundation, Colson has presented no argument regarding how this investigation amounts to an adverse employment action. The investigation itself took place at the request of the Thomasville Police Department and originated based on a complaint from the Foundation that it had not received the recycling funds for a period of years. While Colson's perception may be that Chief Croft had some hand in the investigation, there is no evidence to that effect. Nor is there any evidence that being named as a suspect, or even his eventual arrest, resulted in any change in Colson's position or rate of pay.

Because neither Colson nor Bradshaw have satisfied their burden of setting forth a *prima facie* case of retaliation, the Court grants Defendants' motion for summary judgment on this claim.

41

### E.    Hostile Work Environment

Plaintiffs contend that the Thomasville Fire Department maintains an environment that is hostile toward African-American firefighters. However, Plaintiffs have not presented adequate facts to support this claim. Title VII is violated "when the workplace is permeated with racially discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)) (internal punctuation omitted). The same is true under § 1981. See Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010); see also Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Shields v. Fort James Corp., 305 F.3d 1280, 1282, n.2 (11th Cir. 2002). An employer therefore is liable to an employee for  a racially hostile work environment where the employee proves that "(1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." Id.

The court will consider "the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." Rojas v. Florida, 282 F.3d 1339, 1344 (11th Cir. 2002). However, "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently impact the conditions of employment to trigger the applicability of Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). Racial slurs must "be so 'commonplace, overt and denigrating that they create[ ] an atmosphere charged with racial hostility.'" Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990)). Discourteousness and rudeness do not equate to racial harassment, nor does a lack of racial sensitivity alone amount to actionable harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (internal quotations and citations omitted).

In support of their hostile work environment claim, Plaintiffs list a variety of allegedly derogatory remarks and e-mails that span a number of years and none

of which amount to more than racial insensitivity, such as the allegations relating to the isolated use of the "N" word and the e-mail depicting the aging of President Obama. The most egregious scenario described by Plaintiffs is the incident involving the discovery of a rope tied as a noose and attached to Bradshaw's bed in the fire station. As distasteful as this act was, it again was an isolated event and one that was reported to local authorities and investigated, though not to Bradshaw's satisfaction. Plaintiffs' other allegations that they endured a hostile environment because White firefighters received preferential treatment in terms of study materials and other advantages in the testing arena are not supported by the evidence and do not constitute the sort of threatening or intimidating or humiliating conduct the law requires to maintain a hostile work environment claim. The Court accordingly grants Defendants' motion for summary judgment on Plaintiffs' hostile work environment claims.

## III.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 24) is granted, and this case is dismissed with prejudice.

**SO ORDERED**, this the 30th day of September, 2016.

*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

aks

44